**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **LIZZIE M. WATKINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION NO. 1:20-00244-JB-N** |
| | ) |
| **CSA EQUIPMENT COMPANY, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION**

This Memorandum Opinion follows the Court's Order (Doc. 52) concluding Defendant

CSA Equipment Company, LLC's ("Defendant") Motion for Summary Judgment (Doc. 31) is due

to be granted.

**I.      BACKGROUND**

Defendant terminated Plaintiff on September 19, 2018.  Plaintiff's termination was

negotiated to an unpaid suspension and final warning, and Plaintiff returned to work on January

29, 2019.   Plaintiff filed this action on April 27, 2020, alleging a single claim for gender

discrimination.  (Doc. 1 (Plaintiff alleges "unlawful employment discrimination based on sex in

violation of Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991.")).

Defendant moves for summary judgment on the alternative grounds that Plaintiff cannot

establish a *prima facie* case of gender discrimination and cannot demonstrate Defendant's

reasons for terminating her were pretextual.  (Docs. 31 and 32).

II.      UNDISPUTED FACTS

A. Plaintiff's Employment under a Union Working Agreement

Defendant performs various cargo operations at the Port of Mobile ("Port").  Plaintiff has worked for Defendant since 2010 as a member of the International Longshoremen's Association Local Union 1410-1 ("Union").  (Doc. 1).  Defendant and the Union are parties to a collective bargaining agreement, called the "Working Agreement," which covers work performed by warehouse workers such as Plaintiff.  (Doc. 32, Exhibits A, B and C).  "Warehouse work" includes operating equipment, such as forklifts, to transport cargo between warehouses and railcars.  (*Id.*, Exhibits B and C).

The Working Agreement authorizes Defendant to discipline Union workers.  (*Id.* at Exhibit C).  Defendant may impose discipline "up to and including discharge and permanent ineligibility for hire" for "just cause." (*Id.*).  "Just cause" includes misconduct and failing to perform assigned jobs in compliance with Defendant's "establish[ed] standards of performance" and "safety rules." (*Id.*).

In the event of a dispute over the discipline of a Union worker, the Working Agreement provides Defendant and the Union with a three-step grievance process ("Grievance Process"). (*Id.*).  Under the Grievance Process, a written "grievance" is presented to the other party's representative.  (*Id.*).  Step 1 of the Grievance Process is a hearing before a grievance committee made up of two representatives of both Defendant and Union.  (*Id.*).  The Grievance Process moves to Step 2 if the grievance committee fails to reach a resolution.  (*Id.*).  Step 2 provides for a hearing by an appeals committee comprised of one designated official each from Defendant

and Union. (*Id.*). Failing a resolution by the appeals committee, Step 3 provides for arbitration before the Federal Mediation and Conciliation Service. (*Id.*).

### B. Plaintiff's Disciplinary Record

During her employment with Defendant, Plaintiff was the subject of numerous incident reports,[1] suspended twice, and terminated three times. Each of Plaintiff's terminations was submitted to the Grievance Process, in which Plaintiff was represented by the Union. (Docs. 40-1 and 31-2). Plaintiff's terminations, including her last termination in 2018 which is the subject of this action, were negotiated to unpaid suspensions. (Docs. 40-1 and 31-2,). Plaintiff contends Defendant was "required" to reinstate her after each termination. (Doc. 36-1). Plaintiff's contention, however, mischaracterizes undisputed facts in the record, and ignores others. Even in the light most favorable to Plaintiff, the undisputed facts establish Defendant was not required to reinstate Plaintiff. Rather, the reinstatements were the result of negotiated settlements with the Union achieved in the Grievance Process. It is also undisputed that Plaintiff was not merely reinstated in each instance; she was suspended without pay and warned. Following her 2018 unpaid suspension, Plaintiff returned to work on January 29, 2019.

Plaintiff's disciplinary record includes the following undisputed particulars. Plaintiff was the subject of five incident reports from 2011 to 2012. (Doc. 32, Exhibits D and E). These incidents reports included citations for improper operation of equipment/machinery, refusals to follow orders, failing to follow up with a foreman/supervisor, a safety violation for failure to wear a seat belt while operating a forklift, and sitting in her car rather than performing work. All five

---

[1] Defendant submits "Incident Reports" to the Union, which relate to workers' disciplinary problems, negligent performance of duties, or inability to perform assigned tasks. (Doc. 31-4).

incident reports were forwarded to the Union.  Plaintiff did not file a grievance for any of these reports.

During 2014 and 2015, Plaintiff was cited with six more incident reports and terminated. (*Id.*).  The incident reports cited Plaintiff's use of a cell phone in violation of the Working Agreement, failure to return to work after lunch which left her work gang shorthanded,[2] inability to perform tasks she had accepted, and failing to remain on a job.  Another report included a citation for Plaintiff's leaving a job as a driver of cargo moving equipment on October 28, 2015. Plaintiff had requested the assistance of an additional driver and piece of equipment, but Defendant denied the request.  (*Id.*, Exhibit D).  Plaintiff informed Defendant she did not want to do all the work while her co-workers did "absolutely nothing" and got "paid as well."  *(Id.).* Plaintiff then left the job, and it was completed by another female.  (*Id.*).  Defendant initially suspended, then terminated Plaintiff.  (*Id.*).  By letter dated November 3, 2015, Defendant advised the Union that Plaintiff was terminated for "just cause" and was declared ineligible for hire based on the October 28 incident and her disciplinary history.  (*Id.*, Exhibits C and D).  The Union filed a grievance which resulted in the conversion of Plaintiff's termination to an unpaid two-week suspension and final warning.  Defendant explained its decision in a November 11, 2015 letter to Plaintiff's Union:

> Based on [Plaintiff's] past disciplinary records, including insubordination, disruption of operations and disregard for safety rules [her previous cell phone violation], [Defendant] initially made the decision to terminate her employment and declare her ineligible for hire after her most recent failure to follow her Foreman's directives and disruption of the work on November 3, 2015.[3]  After

---

[2] This incident resulted in Plaintiff's suspension and ineligibility for hire for 48 hours. (Doc. 40-1).

[3] In its brief, Defendant corrects the date of the referenced "disruption" to October 28.  This appears to be correct, and Plaintiff does not dispute the correction.

> consultation with you, however, Defendant has agreed to suspend [Plaintiff] for two weeks *in lieu* of termination.
> …
>
> This is also a final warning to [Plaintiff] that *any further misconduct*, including disruption of operations, insubordination or disregard of safety rules, will result in her termination and ineligibility for hire by [Defendant].

(Doc. 40-1).

In 2016, Plaintiff was cited with four more incident reports and terminated a second time. Three reports cited Plaintiff for refusing orders, an intentional work slowdown, inability to perform assigned work, a safety violation, and work disruption.  Plaintiff did not file a grievance for these reports.

The fourth incident report in 2016 arose from Plaintiff's use of her cell phone while operating a forklift, in violation of the Working Agreement.  (Doc. 40-1).  In a letter dated October 11, 2016, Defendant again terminated Plaintiff and declared her ineligible for hire based on her "continued disruption of operations and safety."  (Doc. 40-1).  A grievance was filed, which was settled by Plaintiff receiving an unpaid three-month suspension and "no further chance."  (*Id*.). This time, a Union officer met with Plaintiff and ensured she understood the terms of the settlement.  (Doc. 31-4).  On March 6, 2017, Plaintiff signed the "final warning," called a "last change agreement," which stated:

> Any further misconduct, including disruption of operations, insubordination or disregard of [Defendant's] Safety Rules, will result in the immediate termination and ineligibility for hire of [Plaintiff] by any division of [Defendant].

(Doc. 40-1).

In 2018, Plaintiff was cited with four more incident reports and terminated.  Three of the reports cited inappropriate work attire, improper hooking of a rail car, work slowdown, and failing to remain on the job.  (Doc. 40-1).  Plaintiff did not file a grievance for these reports.

The fourth report in 2018 arose out of an incident that occurred on September 12 ("September 12 Incident").  Plaintiff got a forklift stuck alongside a Port railroad track and left it there when she got off work.  (Doc. 31-4).  The lift was removed later the same day following the Port's notice to Defendant that the abandoned forklift presented a serious situation.  (Doc. 31, Exhibits C and H).

The following day, on September 13, Defendant interviewed Plaintiff and others, and conducted a safety meeting to address the situation.  The meeting was attended by Plaintiff, her Union representative, and various of Defendant's safety and operations personnel.  (Doc. 31, Exhibit C).  According to Defendant's operations manager, Plaintiff was uncooperative and refused to answer questions during the safety meeting.  (*Id.*).  Plaintiff's conduct during the safety meeting was also the subject of a complaint filed by Defendant's Safety Supervisor.  The Supervisor's complaint, filed with the Port Authority Police, alleged Plaintiff pointed her finger at him and said, "[a]nything that goes on in this meeting will come back on you," which the Supervisor deemed a "personal threat."  (Doc. 31-3).  After the investigation, Plaintiff was cited for "damaging or abusing equipment or gear," failing to timely report the incident to a foreman and was suspended pending further investigation.  (*Id.*).  Mr. Bradford and Mr. Hart were also cited for the September 12 incident.  (*Id.*).

On September 19, 2018, Defendant decided to terminate Plaintiff and declare her indefinitely ineligible for hire.  (Doc. 31-2).  Defendant informed Plaintiff's Union President of its

decision by letter dated the same day, which set out the reasons for Plaintiff's termination as follows:

> As you know, [Plaintiff] has an extensive past disciplinary record while performing work for [Defendant].  Her most recent infractions included the following:
>
> - On November 11, 2015, [Defendant] terminated [Plaintiff's] employment and declared her ineligible for hire because she refused to follow her Foreman's instructions, and she disrupted the work on November 3, 2015. After consultation with you, [Defendant] agreed to suspend [Plaintiff] for two weeks in lieu of termination and to issue her a "*Final Warning*'' to confirm that "*any further misconduct, including disruption of operations, insubordination or disregard of safety rules, [would] result in her termination and ineligibility for hire by [Defendant].*'' . . .
>
> - On October 5, 2016, [Defendant's] Safety Director David Hunter observed [Plaintiff] operating a [Defendant's] truck while talking on her cell phone, a serious safety violation. Based on her violation and the fact that she was working under a *Final Warning*, [Plaintiff] was terminated for her "*continued disruption of operations and safety*." … Nevertheless, during the grievance proceedings on the Union's grievance on [Plaintiff's] termination, you and [Defendant's] President Dan Wilkins agreed that [Defendant] would impose a three-month suspension *in lieu* of termination. At that time, the parties also agreed: "*There will be no other chance*." To ensure [Plaintiff] understood, ILA District Representative James Campbell personally advised [Plaintiff]: "*There will be no other chance.*" Based on that agreement, [Defendant] agreed [Plaintiff] would be permitted to return to work after her three-month suspension. . . .
>
> - Upon [Plaintiff's] return to work after her three-month suspension, [Defendant] issued [Plaintiff] the agreed-upon written "*Final Warning*" to ensure she understood that:
>
> > "any further misconduct, including disruption of operations, insubordination, or disregard of CSA's Safety Rules, *will result In the immediate termination and ineligibility for hire of [Plaintiff] by any division of CSA Equipment Company*."

Notwithstanding her previous "final warnings," [Plaintiff] was operating a 12-Ton Single Pull Tire Lift when she negligently tried to cross a *railroad track* through soft dirt and gravel rather than proceeding some 25 feet to a paved crossing. The Lift got stuck adjacent to and partially on the railroad track maintained and operated by the Alabama State Port Authority. [Plaintiff] left work upon completion of her shift at 5:00 p.m. without reporting to management that the Lift was still stuck and partially on the railroad track, creating a dangerous condition that could have caused a serious accident.  Fortunately, the Lift was discovered by Port Authority Police later that evening while Port Authority employees were in the process of spotting railroad cars to be dispatched to a vessel as requested by [Defendant].

During an ensuing investigatory meeting with a Port Authority police officer, [Defendant's] Equipment Operations Manager Kenny Hirsch, Safety Director David Hunter and [Defendant's] Assistant Operations Manager Alan Carrio, [Plaintiff] became disruptive. She pointed her finger at Mr. Carrio and in a loud and insubordinate manner stated: "Anything that goes on at this meeting will come back on you.''  ...

[Plaintiff's] serious safety violation and her ensuing hostility during the investigation process, all of which occurred while on a *Final Warning*, is unacceptable. [Defendant] is terminating Ms. Watkins' employment effective immediately and she is indefinitely ineligible for hire.

We appreciate your consideration as President of ILA Local 1410·1. If you have any questions, please let me know.

(Doc. 31-3 (italicized emphasis in original)).

Plaintiff filed a grievance challenging her termination.  (Doc. 31-4).  She also filed a charge of retaliation with the National Labor Relations Board ("NLRB"), alleging Defendant had retaliated against her for engaging in "Union and other protected concerted activities."  (*Id*.).  Plaintiff's grievance regarding her termination was settled by the Grievance Process, by converting her termination and ineligibility for hire to an unpaid suspension and final warning.  (Docs. 31-2 and 31-6).  Plaintiff accepted this settlement and returned to work following her unpaid suspension.

(Doc. 1). The NLRB then dismissed Plaintiff's retaliation charge based on the settlement of her grievance. (Doc. 31-7).[4]

After Plaintiff settled her grievance and returned to work, she filed an EEOC charge claiming, for the first time, that Defendant had terminated her based on her gender. (Doc. 5-1). The EEOC dismissed Plaintiff's charge with a finding of "no cause." (Doc. 5-2). Plaintiff filed this action with a single count of gender discrimination.

### III. ANALYSIS

#### A. Jurisdiction, Venue, and Summary Judgment Standard

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to

---

[4] The Working Agreement provided an Equal Employment Opportunity procedure by which Union employees could pursue complaints of discrimination. (Doc. 31-2). Plaintiff did not file an EEO complaint for the instant matter, although she had filed five complaints about other matters over the preceding seven years.

present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322, 23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  On the other hand, a district court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A reviewing court is restrained during summary judgment proceedings from making the sort of determinations ordinarily reserved for the finder of fact at a trial. *See Strickland v. Norfolk Southern Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citations and quotations omitted).  After the non-moving party has responded to the motion for summary judgment, the district court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *see also Arthur v. Thomas*, 974 F. Supp. 2d 1340, 1344 (M.D. Ala. 2013).

### B.  Defendant's Motion for Summary Judgment

The parties agree that the familiar *McDonnell Douglas* burden shifting framework applies. Under *McDonnell Douglas*, the employee bears the initial burden to prove a prima facie case of gender discrimination. *Chavez v. URS Fed. Tech. Servs.*, 504 Fed. Appx. 819, 820 (11th Cir. Jan.

3, 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).   If Plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.   *Id.*   If the employer articulates such a reason, the employee bears the "ultimate burden of proving the reason to be a pretext for unlawful discrimination."   *Chavez*, 504 Fed. Appx. at 821 (quoting *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)).

In its Motion for Summary Judgment, Defendant argues Plaintiff has failed to prove a prima facie case of gender discrimination.   Alternatively, Defendant contends it has articulated legitimate, nondiscriminatory reasons for Plaintiff's termination which she cannot prove to be pretext for gender discrimination.

### 1.   Plaintiff has failed to establish a *prima facie* case

To establish a prima facie case of gender discrimination, Plaintiff must show (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) Defendant treated similarly situated male employees more favorably; and (4) she was qualified to do the job from which he was discharged.   *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000); *see also Marks v. N.Y. Line Ins.*, 2020 U.S. Dist. LEXIS 176211 (S.D. Ala. Sept. 24, 2020).   Defendant's Motion for Summary Judgment focuses on the third prong of Plaintiff's *prima facie* case.   Namely, Defendant contends Plaintiff cannot demonstrate that similarly situated males were treated more favorably than she.   (Doc. 32).

In the Eleventh Circuit, a Title VII plaintiff must show that she and her comparators are "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019).   Similarity in "all material respects" does not require Plaintiff to prove that a proffered

comparator is identical or "nearly-identical" to her.  *Id.* at 1227.  Rather, the standard turns on "substantive likenesses."  *Id.* at 1228.  The Plaintiff and her proffered comparators "must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'"  *Id.* (quoting *Young v. UPS*, 575 U.S. 206, 231 (2015)).  "Ordinarily, for instance, a similarly situated comparator" will have engaged "in the same basic conduct," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," and "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff."  *Id.* at 1227 - 28.

Further, a similarly situated comparator will share the plaintiff's employment or disciplinary history.  *Id.* at 1228 (citing *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016) ("'[d]ifferences in experience and disciplinary history' can disqualify a plaintiff's proffered comparators.")).  *See also*, *Hill v. Houchens Food Grp., Inc.*, 2020 U.S. Dist. LEXIS 93419, at *17 (S.D. Ala. May 27, 2020) ("Proper comparators generally have similar disciplinary records.").

Plaintiff identifies the following male comparators:  Jerome Elliot, Freddie Gaines, Leger McShane, Greg Perryman, and Jerry Jones.  (Doc. 36-1).  In the light most favorable to Plaintiff, they were involved in lift incidents causing equipment or property damage but were not terminated as a result.  (*Id.*).  However, there are unrefuted material differences between their misconduct and Plaintiff's.  Furthermore, Plaintiff provides scant to no evidence of the comparators' disciplinary history.

Of Plaintiff's comparators, Jerome Elliot's lift incident is most like Plaintiff's September 12 Incident.  Mr. Elliot was suspended pending remedial training for getting a lift stuck adjacent to

railroad tracks.  Plaintiff contends, and for purposes of the Motion the Court takes as true, that she and Mr. Elliot both called for assistance.[5]  However, it is undisputed that Mr. Elliot had not taken a short cut in his lift, and that he had remained on site and assisted in removing the lift. (Doc. 31-8).  Further, there is no evidence that Mr. Elliot was uncooperative or disruptive at the ensuing safety meeting.

Plaintiff's other proffered comparators engaged in misconduct that is materially dissimilar to Plaintiff's misconduct.  Freddie Gaines, for example, damaged railroad cars with a lift.  There is no evidence that he operated the lift in an improper location, got it stuck in a location that posed a safety issue, failed to remain on scene and assist, or was uncooperative and disruptive at a related safety meeting.

Leger McShane was declared ineligible to operate equipment after he failed to follow standard lift operating procedure and toppled it over, which posed a safety issue, and failed to report it.  On another occasion, he damaged a lift by operating it while it was leaking oil. However, there is no evidence in either incident that Mr. McShane got a lift stuck in a dangerous location, failed to remain on scene and assist, or was uncooperative and disruptive in a related safety review meeting.

Greg Perryman received a verbal warning for dropping cargo from a lift causing damage to the cargo and failing to report it.  There is no evidence he created an ongoing safety issue by getting a lift stuck in a dangerous location, failed to remain on scene and assist, or was uncooperative and disruptive in a related safety meeting.

---

[5] For purposes of Defendant's Motion, the Court accepts Plaintiff reported the September 12 Incident.  However, Defendant notes that it became aware of the incident not by notice from Plaintiff but because its Mr. Bradford saw the lift stuck.

Jerry Jones damaged a railcar he was moving with his lift by operating at an excessive speed.  Mr. Jones was given a verbal warning and remedial training.  Mr. Jones also operated a lift that crossed in front of and hit a train he did not hear coming.  (Doc. 37-20).  For that, Mr. Jones was declared ineligible to operate lifts until he "passed the lift operations test again." (*Id.*).  There is no evidence in either incident that Mr. Jones allowed his lift to remain in an unsafe location, failed to remain on scene and assist, or was uncooperative and disruptive in a related safety meeting.

Apart from the material differences in basic misconduct, Plaintiff fails to offer evidence of her proffered comparators' disciplinary histories sufficient for comparison to her own.  Plaintiff's disciplinary history, spanning some 10 years and including 19 incidents and "final warnings," was an express basis of her termination. There is no evidence that any of Plaintiff's proffered comparators had a disciplinary history even remotely similar to Plaintiff's.  The disciplinary histories of the comparators are not in the record.  Considered in the light most favorable to Plaintiff, there are no facts which create a genuine dispute regarding any similarity between Plaintiff's disciplinary history and those of her comparators.  Plaintiff cannot prove that these male comparators are "similarly situated in all material respects."

Plaintiff's also proffers others who were involved in "lift-related incidents" described on "Exhibit A" to a deposition of Defendant's corporate representative.  (Docs. 37-17 and 36-1).  Defendant created the exhibit for purposes of this action, and argues that it is not admissible summary judgment evidence because Defendant's representative did not authenticate it as a business record or otherwise establish its admissibility.  (Doc. 41).  The Court agrees.  However, even if "Exhibit A" was admissible, it would be of no benefit to Plaintiff.  In fact, neither "Exhibit

A" nor the related testimony creates a genuine factual dispute that any person listed on it is "similarly situated in all material respects" to Plaintiff.  Of the ten lift-related incidents described on "Exhibit A," ten involved males and two involved females.  Plaintiff argues the females caused no property damage but received harsher discipline than the males who did.  (Doc. 36-1).  Although none of the ten males was terminated or suspended, Plaintiff notes one of the females "was sent home without pay … for failing to park her lift in the correct location," and "the other female employee … was suspended without pay for five days for insubordination in the presence of customer."  (*Id.*).  Plaintiff, however, does not address all the undisputed facts of the females' misconduct.  The female who parked her lift in an incorrect location did so notwithstanding her attendance at two prior safety meetings addressing the issue.  (Doc. 37-17).  The other female employee's misconduct did not involve equipment operation; she was declared ineligible to work at a location where she failed to properly chock and brake a railcar.  (*Id.*).  Additionally, Plaintiff fails to offer evidence of the disciplinary histories of the persons listed on "Exhibit A" to establish a basis for comparison among them, or with Plaintiff.

In sum, Plaintiff has failed to establish a prima facie case because she has failed to offer comparators who are "sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'"  *Lewis*, 918 F.3d at 1228 (quoting *Young*, 575 U.S. at 231).

### 2.  Plaintiff has failed to prove pretext

 Even if Plaintiff could establish a *prima facie* case, Defendant would still be entitled to summary judgment because it has articulated legitimate, nondiscriminatory reasons for Plaintiff's termination which Plaintiff cannot prove are pretextual.  Under *McDonnell Douglas*, if a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to

articulate legitimate nondiscriminatory reasons for termination.  A defendant's burden here is "exceedingly light."  *Stephens v. Ga. Dep't. of Transp.*, 134 F. App'x. 320, 325 (11th Cir. 2005) (citing *Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir. 1983)).  It is "merely one of production; [the defendant employer] need not persuade the court that it was actually motivated by the proffered reasons." *Wascura v. City of S. Miami*, 257 F.3d 1238, 1243 (11th Cir. 2001) (quotations omitted).

Defendant articulated legitimate, non-discriminatory reasons for Plaintiff's termination in its September 18, 2018 letter to Plaintiff's Union.  The reasons include Plaintiff's extensive disciplinary history, her causing the September 12 Incident while on a final "last chance" warning, and her misconduct during the ensuing safety meeting.  The burden, therefore, shifts to Plaintiff to prove Defendants' articulated reasons are pretextual.

Plaintiff's burden to prove pretext requires her to prove both that each articulated reason is false *and* that gender discrimination was the real reason for her termination.  *See Perry v. Batesville Casket Co., Inc*., 551 F. App'x. 987, 990 (11th Cir. 2014) (a proffered reason "cannot . . . be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (emphasis in original)).  Plaintiff cannot satisfy this burden by showing Defendant "was simply incorrect in its decision[.]"  *Perry*, 551 F. App'x. at 990.  Indeed, as a matter of law, discrimination does not exist "if the employer honestly believed that the employee engaged in misconduct, even if it was mistaken in such a belief[.]"  *Id.*  (citing *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991)).

Moreover, to survive summary judgment, Plaintiff must rebut *all* of Defendant's reasons.

*Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000).   Plaintiff must also "meet [Defendant's proffered] reason[s] head on and rebut [them], and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Perry,* 551 F. App'x at 990 (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)).   This Court's "inquiry, ultimately, 'is limited to whether the employer gave an honest explanation of its behavior.'" *Id.*   In *Elrod*, the Eleventh Circuit described this limited inquiry as follows:

> Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted).

*Elrod*, 939 F.2d at 1470.

At the outset, Defendant argues Plaintiff has not attempted to refute its reason of Plaintiff's misconduct at the safety meeting conducted to address the September 12 Incident. (Doc. 41 at 6).   The Court agrees.   Plaintiff's failure to address this articulated legitimate, non-discriminatory reason for her termination is a failure to prove pretext.   Her claims fail on that basis alone.

Plaintiff fails to prove Defendant's remaining reasons are pretextual.   Plaintiff argues her extensive disciplinary record was merely retaliation for making harassment complaints and engaging in protected activity.   As evidence, Plaintiff relies on an August 2012 incident report made by Roosevelt Foy, a male supervisor who she claims routinely harassed her.   (Doc. 34-1). Plaintiff contends that Foy's August 2012 incident report was filed approximately two months after she made a sexual harassment complaint against him, but the record does not support her contention.   Plaintiff cites an "Exhibit E" as evidence of her complaint against Mr. Foy, but no

such exhibit is attached to her brief. (Doc. 36-1).  The Court notes two harassment complaints by Plaintiff against Mr. Foy; one in September 2016 (Doc. 31-7) and the other in June 2017.  (*Id.*).  Both complaints were made after Mr. Foy's August 2012 incident report against Plaintiff.  The August 2012 incident report cannot be reasonably interpreted as retaliation for complaints made after it.

Plaintiff's contention regarding Mr. Wilkerson fails for the same reason.  Plaintiff's November 2012 harassment complaint against Mr. Wilkerson (Doc. 31-7) came after he issued an incident report against her in February 2012.  (Doc. 31-5).[6]

Plaintiff also relies on declarations of Tracy Watkins, Sherry Walker, and Maurica Thomas. (Doc. 37-16).  However, these declarations are at best conclusory legal allegations which do not create a factual dispute.  *See Griffin v. City of Clanton*, 932 F. Supp. 1357, 1359 (M.D. Ala. 1996).  For example, Tracy Watkins declares she "witnessed favoritism and discrimination against [Plaintiff]," and Maurica Thomas declares there "has been lots of harassment, retaliation is [e]nforced for being not in compliance with their wrong doing."

Plaintiff argues the September 12 Incident is pretext because, she contends, it did not create a dangerous situation.  However, Plaintiff's assessment that the lift did not create a danger is simply a quarrel with Defendant's (and the Port's) assessment.  Such quarrels do not prove pretext.  *Matthews v. City of Mobile, Alabama*, 702 F. App'x 960 (11th Cir. 2017) ("Matthews fails to offer sufficient evidence to support a finding that the City's reason for her termination was

---

[6] Plaintiff also contends her disciplinary record is a product of retaliation by Mr. Hirsch.  In June 2015, Plaintiff filed a complaint alleging he was denying her work opportunities based on her gender. However, Plaintiff cites no evidence to support that complaint and the Court finds none in the record.  The Court likewise finds no support in the record for Plaintiff's contention that a July 2015 incident report evidences the "role that gender played in defendant's disciplinary practices." (Doc. 36-1).

pretextual, or that the City decision makers did not believe that she engaged in the charged conduct.  Instead, Matthews merely quarrels with the City's business decision and with [subject] events"); *Usry v. Liberty Regional Medical Center, Inc*., 560 F. App'x 883, 889 (11th Cir. 2014) (pretext is not established by mere proof that a termination decision is mistaken).  The Court also finds Defendant's conclusion that a dangerous situation existed to be more than unsupported speculation. The Port railroad also determined the situation was dangerous and so notified Defendant.  (Doc. 31-8).  Again, though, the correctness of Defendant's assessment is not the question for purposes of Plaintiff's burden to prove pretext.  The relevant inquiry is whether Defendant had a good faith belief that the presence of Plaintiff's lift stuck alongside a railroad track created a dangerous situation.  *See Elrod v. Sears, Roebuck and Co*., 939 F.2d 1466, 1471 (11th Cir. 1991) (explaining that employee failed to show pretext where he presented evidence suggesting that allegations were untrue but failed to show that his employer's belief in those allegations was not credible).

Plaintiff argues pretext is also demonstrated by what she contends is a change in Defendant's reasons for its decision.  Plaintiff argues there is an inconsistency between the September 19 termination letter and Mr. Hirsch's later testimony, as they relate to the reporting of the September 12 Incident.  Plaintiff argues that while the termination letter states she failed to report the incident to Defendant's management, Mr. Hirsch testified that she did report it.  Plaintiff mischaracterizes Mr. Hirsch's testimony.   He testified Defendant became aware Plaintiff's lift was stuck because its manager, Kenny Bradford, saw it.  Mr. Hirsch did not testify Plaintiff reported it to Mr. Bradford or to any other of Defendant's managers.  (Doc. 31-8).

Plaintiff next argues the temporal proximity of her overtime complaint to her termination is evidence of gender-based retaliatory intent, which establishes pretext.  However, Plaintiff cannot explain how such retaliation may have been based on her gender.  Plaintiff provides no admissible evidence that she was subjected to gender-based retaliation because she claimed overtime pay.  Moreover, retaliation for claiming overtime does not establish a Title VII claim for gender-based retaliation.  Such retaliation may support an NLRB charge, but Plaintiff provides no authority how such a claim might satisfy her burden to prove pretext in her Title VII gender discrimination claim.

Plaintiff also argues pretext is evidenced by the fact that Defendant has never terminated or suspended a male employee for sexual harassment.  Again, Plaintiff provides no evidence of any male employee who engaged in sexual harassment that warranted termination or was not otherwise reasonably disciplined.  She provides no authority as to how Defendant's failure to terminate or suspend male employees for sexual harassment is relevant to proving pretext in her Title VII claim for gender-based discrimination.  *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1313 (11th Cir. 2018) (fact that plaintiff's superior was accused of sexual harassment by other employees was irrelevant).

Apart from Plaintiff's failure to prove Defendant's reasons were pretextual, she has not offered evidence to create a genuine factual dispute that gender discrimination was the actual reason for Defendant's decision.  This is fatal to Plaintiff's claim.  *Perry*, 551 F. App'x. at 990.  In *Usry*, the Eleventh Circuit instructed that an employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  560 F. App'x at 889.  *See also E.E.O.C. v. Total System Services,*

*Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000); *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987); and *Hammons v. Computer Programs and Sys., Inc. (CPSI)*, 2006 U.S. Dist. LEXIS 89952, at *36 (S.D. Ala. Dec. 12, 2006).

Finally, Plaintiff relies on the standard set out in *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321 (11th Cir. 2011).  (Doc. 44-1).  In *Lockheed-Martin*, the Eleventh Circuit held a "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.").  644 F.3d at 1328.  Plaintiff contends there is such "circumstantial evidence," arguing without record citation that the "record establishes that gender discrimination animates defendant's workplace."  (Doc. 44-1).  Without record citation, Plaintiff notes (1) other female employees have also made gender discrimination complaints, (2) she has been the victim of sexual harassment at work, and (3) the "lack of disciplinary record for male employees as compared to [her]."  (*Id.*).

The Court finds Defendant's response to Plaintiff's argument here to be persuasive and concludes Plaintiff's argument fails for the reasons stated in it.  (Doc. 49).  Plaintiff has failed to present a convincing mosaic of circumstantial evidence that her termination was a result of gender-based discrimination.  As for gender discrimination complaints made by other female employees, none relate to the Defendant's Mr. Wilkins who made the decision to terminate Plaintiff.  Although one complaint mentions Mr. Hirsch who recommended Plaintiff's termination to Mr. Wilkins, it is a mere conclusory statement of witnessing "favoritism and discrimination," which is insufficient to overcome a motion for summary judgment.  The complaints also include conclusory "me too" statements that neither implicate Mr. Wilkins or Mr. Hirsch nor situations comparable to Plaintiff's.

Plaintiff's reliance on evidence that she was sexually harassed is misplaced. Such harassment is not circumstantial evidence that Defendant terminated Plaintiff based on her gender. Furthermore, neither Mr. Wilkins nor Mr. Hirsch are the subject of the alleged harassment.

Plaintiff's argument based on the "lack of disciplinary record for male employees as compared to [her]" is undermined, again, by her failure to offer their disciplinary histories. Plaintiff offers no evidence that male employees involved in lift-related incidents were not disciplined or disciplined appropriately. Their disciplinary histories are not in the record. The Court also notes, again, the material differences between the Plaintiff's September 12 Incident and the lift related incidents of the male employees who Plaintiff claims were treated more favorably.

Finally, Plaintiff argues the proximity between September 12 Incident and her demand "for unpaid overtime for herself and coworkers could also support a reasonable factfinder's determination that Ms. Watkins' termination was unlawful." For purposes of a NLRB charge, maybe, but this is not evidence (whether "circumstantial" or otherwise) that Defendant terminated Plaintiff based on her gender. Moreover, arguments relating to temporal proximity alone fail "when legitimate, non-discriminatory reasons for the termination remain undisputed." *Key v. Central Georgia Kidney Specialists, P.C.*, 2020 U.S. Dist. LEXIS 200490, *18 (M.D. Ga. Oct. 21, 2020) (citing *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020).

All of the "circumstantial evidence" which Plaintiff argues (but does not cite), viewed in a light most favorable to her, does not support a reasonable inference of intentional gender discrimination on the part of Defendant.

## CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment (Doc. 31) is GRANTED.

**DONE and ORDERED** this 19th day of January, 2022.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE